RECEIVED
APR 04 2019
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

19cv951 SRN/BRT

STATE OF MINNESOTA
MINNESOTA PROFESSIONAL EDUCATOR
LICENSING AND STANDARDS BOARD

In the Matter of the Teaching License of
Herandez Cortez Evans,

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

File Folder No. 459792

OAH Docket No. 71-1304-35417

The above-entitled matter came before the Minnesota Professional Educator Licensing and Standards Board on April 12, 2019, following the issuance by Administrative Law Judge ("ALJ") Jessica Palmer-Denig of Findings of Fact, Conclusions of Law and Recommendation that discipline be imposed on the teaching licenses of Heràndez Cortez Evans. A copy of the ALJ's Findings of Fact, Conclusions of Law and Recommendation is attached as Exhibit 1 and incorporated herein by reference.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The ALJ's recommendation, including the findings of fact and conclusions of law, is adopted in its entirety. Based on its independent review of the record, the Board makes the following:

SCANNED
APR 05 2019
U.S. DISTRICT COURT ST. PAUL

# ORDER

IT IS HEREBY ORDERED THAT the Minnesota teaching licenses of Herandez Cortez Evans are revoked.

Dated: _____, 2019

MINNESOTA PROFESSIONAL EDUCATOR LICENSING AND STANDARDS BOARD

_____

By _____

Its Acting Chairperson[1]

---

[1] The Acting Chairperson signed the order on behalf of the Board because the Board's Chairperson is a member of the Board's Disciplinary Committee and accordingly abstained from voting in this matter.

Exhibit 1

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS

FOR THE PROFESSIONAL EDUCATOR LICENSING AND STANDARDS BOARD

| | |
|---|---|
| In the Matter of the Teaching License of Herandez Cortez Evans | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDATION |

This matter came before Administrative Law Judge Jessica A. Palmer-Denig for a hearing on February 15, 2019. The record remained open until March 1, 2019, to permit the filing of additional exhibits and written closing arguments.[1]

Jennifer A. Kitchak, Assistant Attorney General, appeared on behalf of the Disciplinary Committee (Committee) of the Minnesota Professional Educator Licensing and Standards Board (Board). Herandez Cortez Evans (Licensee) appeared on his own behalf and without counsel.

## STATEMENT OF THE ISSUES

1. Did Licensee engage in immoral conduct in violation of Minn. Stat. § 122A.20, subd. 1(a)(1) (2018)?

2. Did Licensee engage in conduct toward students, in order to reform student conduct, in a manner that was not reasonable disciplinary action under Minn. R. 8710.2100, subp. 2(D) (2017)?

## SUMMARY OF RECOMMENDATION

The Administrative Law Judge concludes that the Committee established by a preponderance of the evidence that Licensee engaged in immoral conduct in violation of Minn. Stat. § 122A.20, subd. 1(a)(1), and that his conduct toward students to reform their behavior was not reasonable disciplinary action and violated Minn. R. 8710.2100, subp. 2(D). Therefore, the Administrative Law Judge concludes that the Board should impose discipline upon Licensee's license.

Based on the evidence in the hearing record, the Administrative Law Judge makes the following:

---

[1] Licensee filed a written closing argument on February 23, 2019, and filed a second closing argument with an "addendum" on February 27, 2019. The Administrative Law Judge has considered both documents in making this recommendation. Additionally, the Committee filed amended Exhibits 10 and 14 which redact last names of minor children.

## FINDINGS OF FACT

1. Licensee has been licensed as a teacher in Minnesota since 2011.[2]

2. Licensee currently holds two teaching licenses; the first permits him to teach students in kindergarten through sixth grade and the second allows him to serve as a substitute teacher.[3]

3. Since becoming licensed, Licensee has held teaching positions at approximately 12 different schools.[4] In many instances, Licensee has not left these positions voluntarily.[5] In 2011, Licensee left his first teaching job after three months when he was accused of punching a student in the nose.[6] On other occasions he has been laid off or his contract has not been renewed.[7]

4. From March 22, 2017 until April 25, 2017, Licensee taught second grade at Bethune Community School (Bethune) in Minneapolis, Minnesota.[8] Generally, students in Licensee's class were seven and eight years old.[9]

5. Bethune is a community school located in North Minneapolis.[10] Bethune's student population has a high poverty rate.[11] Ninety-five percent of its students qualify for free or reduced price lunch, 17 percent are considered homeless or highly mobile, and nearly 20 percent qualify for special education services.[12] Because Bethune is a challenging teaching environment, many seasoned teachers do not wish to work there and often teaching positions are staffed by newer teachers.[13] Notwithstanding the challenges, current and former staff members consider Bethune to be a "welcoming" and "inviting" place,[14] and that it is "like a family."[15]

6. Licensee began teaching at Bethune following the departure of a teacher halfway through the year.[16] During the interim period before Licensee started at Bethune, Licensee's classroom was overseen by a long-term substitute, Kevin Vincal (Vincal).[17]

---

[2] Testimony (Test.) of Herandez Cortez Evans.
[3] Id.
[4] Id.
[5] Id.
[6] Id.
[7] Id.
[8] Id.
[9] See Exhibits (Exs.) 3-7.
[10] Test. of Cheryl Martin.
[11] Id.
[12] Id.
[13] Id.
[14] Test. of Matthew Myrold.
[15] Test. of C. Martin.
[16] Id.
[17] Id.

2

[126427]

7. Erin Averbeck (Averbeck) teaches second grade in the room next door to the classroom where Licensee's taught, and the two rooms are connected by an internal doorway.[18]

8. The wall between Averbeck and Licensee's classrooms is thin and Averbeck noticed that Licensee's classroom was regularly very loud.[19] The children in Averbeck's class also remarked on the noise level to her.[20]

9. On one occasion, Averbeck entered Licensee's classroom through the connecting door to check on Licensee's class due to the high noise level.[21] Averbeck witnessed Licensee holding a child in the air with his hands under the child's armpits.[22] Averbeck thought the child appeared "taken aback."[23] Averbeck asked Licensee whether she could offer assistance and Licensee responded that she could help him by "getting out of the room and locking the door behind [her]."[24]

10. Bethune utilizes behavior support employees, called "behavior deans," to respond to behavioral issues.[25] After Licensee told Averbeck to leave his classroom, Averbeck called the school's behavior support staff because she was worried about the safety of that child and the other children in Licensee's classroom.[26]

11. Eric Angell (Angell) was employed as an associate educator at Bethune during this time.[27] Angell's duties included working with children in three second grade classrooms, providing literacy and math tutoring and general classroom support.[28]

12. Angell worked with children in Licensee's classroom for 30 to 45 minutes in the morning and in the afternoon, doing exercises designed to help students reach their grade level in literacy and math.[29]

13. When Licensee began teaching at Bethune, Angell's schedule in the classroom initially remained the same.[30] After a week or so, however, Licensee did not want Angell in the classroom during Angell's scheduled sessions.[31] Licensee indicated he wanted to form a bond with the students and Angell's presence in the classroom prevented Licensee from doing so.[32]

---

[18] Test. of Erin Averbeck; Test. of H. Evans; Ex. 109.
[19] Test. of E. Averbeck.
[20] Id.
[21] Id.
[22] Id.
[23] Id.
[24] Id.
[25] Id.; Test. of M. Myrold; Test. of Eric Angell; Test. of C. Martin.
[26] Test. of E. Averbeck.
[27] Test. of E. Angell.
[28] Id.
[29] Id.
[30] Id.
[31] Id.
[32] Id.

3

[126427]

14. Angell did not agree to stay out of the classroom.[33] Angell continued visiting the classroom to work with students, but each time Licensee told Angell to leave.[34]

15. Licensee also locked the door to the classroom and would not allow Angell to enter.[35] If a student opened the door to allow Angell into the classroom, Licensee would tell Angell to leave, and close the door behind him, locking Angell out of the classroom again.[36]

16. Other teachers at Bethune did not regularly lock their classroom doors.[37]

17. At one point Angell and Licensee had an argument in the hallway regarding Angell's presence in the classroom, with raised voices, which was witnessed by several students and staff.[38] After this incident, Angell spoke with Bethune's principal, Cheryl Martin (Principal Martin), about what happened and Angell's concerns about Licensee's decision to bar Angell from the classroom.[39]

18. On one occasion, Angell observed Licensee's interaction with a student who was having a breakdown in the classroom; Licensee picked the student up from the floor, carried the child out of the classroom by the armpits, and put the child in the hallway.[40]

19. On at least one other occasion, Angell observed Licensee place another child, who was upset, into the hallway.[41] Licensee then locked the door so the child could not re-enter the classroom, and the child pounded on the door in an attempt to get back inside.[42] Licensee left the child outside the classroom without direct supervision by an adult.[43]

20. Other teachers at Bethune did not leave children who were distressed in the hallway unsupervised.[44]

21. On April 19, 2017, an art teacher found one of Licensee's students, K.M., in the second grade hallway "looking sad."[45] The teacher brought K.M. to Principal Martin.[46] K.M. told Principal Martin that Licensee "squeezed [her] hand and it hurt," and

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] Ex. 14 at PELSB0063; *see also* Test. of C. Martin.
[46] Ex. 14 at PELSB0063.

4

that he "took [her] hand and put [her] out of the room."[47] K.M. identified other students who saw these events, and when those students were interviewed, one student reported that:

> [Licensee] spankes [sic] our butt, smacked our head and squeezed our hand. He makes a face and says "I'm gonna tear you up." We want a different teacher in our class. Mr. V didn't do nothing, but [Licensee] hits us.[48]

22. Another student reported Licensee had restrained him in the past and held the student's wrist to separate him from another student. The student reported sometimes Licensee was joking and other times he was not, and that Licensee kept children out of the class.[49]

23. A third student stated that he liked Licensee and that Licensee was "fun," but also reported Licensee "plays like he's spanking us," and that Licensee "yells at some kids and taps their heads too."[50]

24. Principal Martin spoke with Licensee regarding the complaints.[51] Licensee denied engaging in inappropriate physical contact with students, though he acknowledged putting students outside his classroom for a timeout.[52] Principal Martin stressed to Licensee that he "should never put hands on a child," and Licensee stated he understood that.[53] Principal Martin told Licensee that she would make a maltreatment report regarding the students' complaints.[54]

25. Principal Martin called the Minnesota Department of Education (MDE) to report her concerns about possible maltreatment and left a message.[55] MDE's investigator returned Principal Martin's call on April 20, 2017, indicating that Principal Martin's conversation with Licensee and his denial could serve as a warning, and that any further allegations of the same or similar conduct would require formal reporting.[56]

26. Matthew Myrold (Myrold) was a special education teacher at Bethune during Licensee's tenure at the school.[57]

27. On April 20, 2017, Myrold discovered two children, K.W. and K.B., in the hallway outside Licensee's classroom.[58] Both children qualified for special education

---

[47] Id.
[48] Id.
[49] Id.
[50] Id.
[51] Id.
[52] Id.
[53] Id.
[54] Id.
[55] Id.
[56] Id.
[57] Test. of M. Myrold.
[58] Id.; Ex. 8.

services; K.B. required an escort when moving around the school and K.W. was considered medically fragile.[59] No adult was supervising the children in the hallway.[60]

28. When Myrold encountered them, the children were locked out of Licensee's classroom.[61] K.W. was curled up on the floor, crying, and he appeared frightened.[62] The children told Myrold that Licensee "kicked them out of class."[63]

29. Myrold knocked on the door to Licensee's classroom, and when Licensee answered, Myrold asked if the students could return to class.[64] Licensee denied the children re-entry to the classroom.[65]

30. Myrold challenged Licensee's decision because he did not believe it was appropriate to lock special education students out of the classroom without supervision or support.[66] Licensee became agitated and raised his voice with Myrold.[67] Myrold felt it was improper for Licensee to behave in that manner in the children's presence, so Myrold began to take K.B. and K.W. down the hallway away from the classroom.[68] As Myrold walked away with the children, Licensee taunted Myrold to "Keep wearing [your] Black Lives Matter T-shirt."[69]

31. On occasion, a student may be removed from a classroom.[70] However, at Bethune, teachers are not permitted to discipline students by locking them out of the classroom without adult supervision.[71]

32. On another occasion, while passing Licensee's classroom, Myrold saw Licensee through the window holding a child up by the child's wrists so that the child's feet were not touching the ground.[72] To Myrold, it appeared the student was frightened or in pain.[73]

33. Myrold reported both of these incidents to Bethune's administration.[74] Principal Martin had a meeting with Myrold, Licensee, and the assistant principal,

---

[59] Test. of M. Myrold.
[60] Id.
[61] Id.
[62] Id.
[63] Id.
[64] Id.
[65] Id.
[66] Id.
[67] Id.
[68] Id.
[69] Id. The record contains conflicting evidence about whether Licensee used an expletive in making this statement. See Test. of H. Evans; Test. of M. Myrold; Ex. 8. The Administrative Law Judge concludes that there is insufficient evidence to support a finding that Licensee used an expletive and that such a determination is not material to the outcome of this case.
[70] Test. of M. Myrold.
[71] Id.; Test. of C. Martin.
[72] Test. of M. Myrold.
[73] Id.
[74] Id.; Ex. 8.

Jasper Jonson, to talk about these incidents.[75] At the meeting, Licensee was confrontational and accused Myrold of being a racist.[76]

34. On April 24, 2017, Averbeck encountered two children from Licensee's classroom on the swings outside after school.[77]

35. Averbeck had been concerned for some time about what might be happening in Licensee's classroom.[78]

36. Averbeck asked the children about the reason for the noise and the children told Averbeck that they were "naughty."[79] Averbeck asked the children what happens when they are naughty.[80] Averbeck believed that the children felt they were not supposed to tell her.[81] Ultimately, however, the children told Averbeck that Licensee hit them on their head and face, spanked them, and squeezed their arms.[82]

37. Averbeck then saw another child from Licensee's classroom on the playground.[83] Averbeck approached that child as well, and asked the same question about the noise in Licensee's classroom.[84] That child reported to Averbeck that the same things had been happening to her.[85]

38. Averbeck secured supervision for the children on the playground and went inside the school to find Principal Martin.[86] She was unable to meet with the principal at that time, but she sent an email to Principal Martin reporting the children's statements and her concerns.[87]

39. Averbeck had recently attended a training regarding reporting of maltreatment.[88] Averbeck looked up the information necessary to make a maltreatment report and she faxed maltreatment forms to MDE.[89] Initially she submitted a general report, but following further instructions from MDE, she submitted a more detailed report with additional information.[90]

40. On April 25, 2017, Principal Martin was meeting with parents of a student when the school's secretary informed her that Licensee was leaving and terminating his

---

[75] Test. of M. Myrold; see also Ex. 8 (noting "Meeting ... Monday 4-24").
[76] Test. of M. Myrold.
[77] Test. of E. Averbeck; Ex. 9.
[78] Test. of E. Averbeck; Ex. 9.
[79] Test. of E. Averbeck.
[80] Id.
[81] Id.
[82] Id.; Ex. 9.
[83] Test. of E. Averbeck.
[84] Id.
[85] Id.
[86] Id.
[87] Id.; Ex. 9.
[88] Test. of E. Averbeck.
[89] Id.
[90] Id.

7

employment at Bethune.[91] The secretary was concerned that Licensee did not understand the consequences he would face if he abandoned his job.[92] The secretary went outside the school and asked Licensee to return to speak with Principal Martin.[93] Licensee agreed, and when he met with Principal Martin, he told her he was quitting the job and that the students were out of control.[94]

41. Principal Martin asked Licensee to stay until the end of the day to cover his classroom, but Licensee refused to do so and left.[95] Principal Martin reported to the school district that Licensee abandoned his job.[96]

42. The day after Licensee left his employment at Bethune, Vincal returned to that classroom as a substitute.[97] That same day, Vincal approached Averbeck, telling her that the children reported being hit, spanked, and squeezed.[98] Vincal was unsure about the steps he needed to take, and Averbeck assisted Vincal in obtaining forms necessary to report maltreatment to MDE.[99]

43. MDE investigated the reports and issued five determinations of maltreatment by physical abuse against Licensee on December 14, 2017.[100]

44. MDE determined that Licensee hit and spanked one student;[101] used corporal punishment, including spanking, slapping, and grabbing very hard, on a second student;[102] hit and spanked a third student on multiple occasions;[103] slapped a fourth student on the head, back, and bottom;[104] and hit and grabbed a fifth student's hand with sufficient force to cause that student to cry and, on one occasion, leaving a lasting mark."[105] During MDE's investigation, multiple witnesses described Licensee's use of corporal punishment on children in his classroom.[106]

45. Students reported to the MDE investigator that Licensee told them that if they "told on" him, "a substitute teacher they did not like would come back to be their teacher."[107]

---

[91] Test. of C. Martin.
[92] Id.
[93] Id.
[94] Id.; Ex. 13.
[95] Test. of C. Martin.
[96] Id.; Ex. 13.
[97] Test. of E. Averbeck; Ex. 10.
[98] Test. of E. Averbeck.
[99] Id.; Ex. 10.
[100] Exs. 3-7.
[101] Ex. 3 at PELSB0018.
[102] Ex. 4 at PELSB0027.
[103] Ex. 5 at PELSB0036.
[104] Ex. 6 at PELSB0045.
[105] Ex. 7 at PELSB0054.
[106] See Exs. 3-7.
[107] Ex. 3 at PELSB0016.

8

46. Witnesses described Licensee locking the door of his classroom, papering over the windows, and denying entry to other staff.[108]

47. Bethune does not have an official policy prohibiting teachers from papering over classroom windows, but it is frowned upon, as the school's expects that a classroom will be visible.[109] When Licensee papered his window, he was told the window should not be covered.[110]

48. MDE's investigator determined that staff could not observe Licensee's "most egregious" behavior because he "kept the classroom isolated."[111] Even so, staff did observe Licensee "holding students' wrists in a painful manner, carrying students out of the classroom, and locking students out of the room."[112]

49. Students also told the MDE investigator how Licensee's actions made them feel, including that it made them feel sad,[113] upset,[114] and mad,[115] with one student describing Licensee making a "mean scowling face."[116] Another student said to the investigator, "I don't get it. Why [did he] do that to us?"[117]

50. Licensee did not seek further review of MDE's maltreatment determinations.[118]

51. On February 22, 2018, the Board notified Licensee that it had begun an investigation into his conduct based upon MDE's maltreatment determinations.[119]

52. Licensee submitted a statement denying that he hit or spanked students, and indicated that the maltreatment reports were fabricated.[120]

53. Licensee used restraining holds, including wrist locks and basket holds, on multiple children in his classroom.[121] Specialized training is required for a school employee to be authorized to use restraining holds on students.[122] Licensee has not participated in this training and is not certified to utilize restraining holds on children.[123]

---

[108] See id. at PELSB0015.
[109] Test. of C. Martin.
[110] Id.
[111] Ex. 7 at PELSB0054.
[112] Id.
[113] Ex. 3 at PELSB0015.
[114] Ex. 4 at PELSB0024.
[115] Ex. 6 at PELSB0042; Ex. 7 at PELSB0051.
[116] Ex. 7 at PELSB0051.
[117] Ex. 3 at PELSB0015.
[118] Test. of H. Evans.
[119] Ex. 1.
[120] Ex. 2.
[121] Test. of H. Evans.
[122] Test. of M. Myrold; Test. of C. Martin.
[123] Test. of H. Evans; Test. of M. Myrold; Test. of C. Martin. Licensee testified that he had training regarding physical restraints when he became a teacher, however, the record shows that Licensee has not had the type of training required to utilize these techniques with students. Test. of H. Evans.

School employees are required to report their use of restraining techniques to the district, but Licensee used restraining holds on children and did not report it.[124]

54. The Committee commenced this case by filing a Notice and Order for Prehearing Conference on July 30, 2018.[125] On January 15, 2019, the Committee filed an Amended Notice and Order for Hearing.[126]

55. Any conclusion of law more properly considered a finding of fact is adopted as such, and any fact identified in the Memorandum below is incorporated herein.

Based on these Findings of Fact, the Administrative Law Judge makes the following:

## CONCLUSIONS OF LAW

1. The Administrative Law Judge and the Board have jurisdiction over this matter pursuant to Minn. Stat. §§ 14.50, 122A.20 (2018).

2. The Committee has complied with all procedural requirements of law and rule and Licensee had notice of, and participated in, the hearing in this matter.

3. The Board may suspend or revoke a teacher's license if the teacher engages in "immoral character or conduct."[127]

4. The Board's code of ethics includes standards of professional conduct for teachers, including that a "teacher shall take reasonable disciplinary action in exercising the authority to provide an atmosphere conducive to learning."[128]

5. The Board may impose discipline upon teachers for violations of the code of ethics, including placing a teacher's license on probationary status, or by suspending or revoking a teacher's license.[129]

6. Under Minnesota law, teachers are forbidden from using corporal punishment to reform, or as a penalty for, unacceptable student conduct.[130] Corporal punishment includes "hitting or spanking a person with or without an object" or unreasonable physical force causing bodily harm or substantial emotional harm.[131]

---

[124] Test. of H. Evans; Test. of M. Myrold; Test. of C. Martin.
[125] Notice and Order for Prehearing (July 26, 2018).
[126] Amended Notice and Order for Hearing (Jan. 14, 2019).
[127] Minn. Stat. § 122A.20, subd. 1(a)(1).
[128] Minn. R. 8710.2100, subp. 2(D).
[129] *Id.*, subp. 5(C)-(D) (2017); *see also* Minn. R. 8710.0800 (2017).
[130] Minn. Stat. § 121A.58, subd. 2 (2018).
[131] *Id.*, subd. 1 (2018).

10

7. Teachers may use "reasonable force" with a student "when it is necessary under the circumstances to correct or restrain a student or prevent bodily harm or death to another."[132]

8. The Committee bears the burden to establish the violations alleged by a preponderance of the evidence.[133]

9. The Committee has established by a preponderance of the evidence that Licensee engaged in immoral conduct.

10. The Committee has established by a preponderance of the evidence that Licensee engaged in unreasonable disciplinary action in violation of the code of ethics.

11. Any finding of fact more properly considered a conclusion of law is adopted as such, and any portion of the Memorandum more properly considered a conclusion of law is incorporated herein.

Based upon these Conclusions of Law, and for the reasons explained in the accompanying Memorandum, the Administrative Law Judge makes the following:

## RECOMMENDATION

The Administrative Law Judge recommends that the Board discipline Licensee.

Dated: March 26, 2019

JESSICA A. PALMER-DENIG
Administrative Law Judge

Reported: Digitally Recorded
No transcript prepared

## NOTICE

This Report is a recommendation, not a final decision. The Board will make the final decision after a review of the record. Under Minn. Stat. § 14.61 (2018), the Board shall not make a final decision until this Report has been made available to the parties for at least ten calendar days. The parties may file exceptions to this Report and the Board must consider the exceptions in making a final decision. Parties should contact Alex Liuzzi, Interim Executive Director, Minnesota Professional Educator Licensing and

---

[132] Minn. Stat. § 121A.582 (2018).
[133] Minn. R. 1400.7300, subp. 5 (2017).

11

[126427]

Standards Board, 1500 Highway 36 West, Roseville, MN 55113, to learn the procedure for filing exceptions or presenting argument.

## MEMORANDUM

### I. Introduction

The Committee contends that Licensee engaged in actions constituting immoral conduct under Minn. Stat. § 122A.20, subd. 1(a)(1), and that his actions to reform student conduct were not reasonable disciplinary action under Minn. R. 8710.2100, subp. 2(D). Specifically, the Committee maintains Licensee's prohibited conduct toward students included spanking, slapping, pinching, grabbing and squeezing their wrists and hands, lifting and carrying them by their hands, wrists, or arms, and locking students in the hallway outside his classroom, such that they were unattended and without adult supervision.[134] Licensee denies engaging in many of those acts. Licensee argues that his actions were reasonable, as well as "morally upstanding and professional."[135] The Administrative Law Judge determines that the Committee has met its burden to show that Licensee's conduct violated the standards of conduct for licensed teachers.

### II. Burden of Proof and Evidentiary Standard

The Committee bears the burden of proof to establish its claims by a preponderance of the evidence.[136] To establish a fact by a preponderance of the evidence, "it must be more probable that the fact exists than that the contrary exists."[137] If the evidence is equally balanced, then that fact or issue has not been proven by a preponderance of the evidence.[138]

### III. Evidence Excluded from the Record

The Administrative Law Judge excluded certain exhibits offered by Licensee from the record. The Administrative Law Judge identified the basis for excluding each exhibit on the record at the proceeding, however, the Administrative Law Judge addresses this excluded evidence in more detail because Licensee's written closing argument references information from one of the excluded exhibits.

The Administrative Law Judge excluded Licensee's proposed Exhibits 100, 103, 104, and 105, which contain information relating to Licensee's claims of race and sex discrimination at another school, years before he taught at Bethune; a code of conduct that did not apply at Bethune; a complaint containing allegations made by police officers in Minneapolis against the Minneapolis Police Department; and a copy of a printout from MDE regarding the Pupil Fair Dismissal Act. The Administrative Law Judge determined that the information in these exhibits was not relevant.

---

[134] See Amended Notice and Order for Hearing at 2 (Jan. 14, 2019).
[135] Licensee's Closing Statement at 2 (Feb. 27, 2019).
[136] Minn. R. 1400.7300, subp. 5.
[137] City of Lake Elmo v. Metropolitan Council, 685 N.W.2d 1, 4 (Minn. 2004).
[138] Id.

12

Relevant evidence "logically or reasonably tends to prove or disprove a material fact in issue, or tends to make such a fact more or less probable, or affords the basis for or supports a reasonable inference or presumption regarding the existence of a material fact."[139] None of the information in Exhibits 101, 103, 104, and 105 bears on the question of whether Licensee engaged in unlawful conduct toward his students while employed at Bethune. The Administrative Law Judge has not considered the excluded evidence or any arguments in Licensee's closing argument regarding information contained in these exhibits.

## IV. Analysis

The Committee has established that Licensee used physical discipline on children in his classroom and that he locked children outside the classroom, without adult supervision. This conduct violated standards applicable to licensed teachers and the Board may impose discipline upon Licensee.

### A. Licensee's Conduct

Licensee acknowledges he engaged in some of the conduct at issue. Licensee admits that he placed children in wrist locks and basket holds to restrain them, testifying this occurred multiple times.[140] Licensee lacked the specialized training and certification for the use of these techniques, and so his actions were unauthorized.[141] Licensee also failed to report his use of these holds to the school district, as required.[142] Further, Licensee admits locking students out of his classroom, leaving them in the hallway unsupervised.[143]

Licensee justifies his conduct, arguing that he was required to use physical restraints to break up fights and that he locked a child outside the class to prevent that child from bullying another student.[144] Licensee taught a classroom of seven- and eight-year-old second graders. No credible justification exists for Licensee's repeated use of unauthorized physical restraints or for isolating children outside his locked classroom door without adult supervision. Even without more, this admitted conduct would be grounds for the Board to discipline Licensee.

The Administrative Law Judge, however, determines that Licensee's actions were more extensive than he admitted. The Administrative Law Judge credits the testimony of three school employees: Angell, Averbeck, and Myrold. These witnesses saw Licensee engage physically with the children, carrying them by their wrists or armpits, and each witness was concerned for the children in Licensee's classroom. The Administrative Law Judge also credits statements made by children in Licensee's class

---

[139] *State v. Horning*, 535 N.W.2d 296, 298 (Minn. 1995); *see also* Minn. R. Evid. 401 1977 comm. cmt.
[140] Test. of H. Evans.
[141] *Id.*; Test. of M. Myrold; Test. of C. Martin.
[142] Test. of M. Myrold.
[143] Test. of H. Evans; *see also* Test. of M. Myrold.
[144] Licensee's Closing Statement (Feb. 27, 2019).

13

[126427]

to Averbeck, Principal Martin, and the MDE investigator. The children reported that Licensee hit and spanked them, and that he hurt them by squeezing their wrists.

Therefore, the Committee has established License used physical discipline, including hitting, spanking, and squeezing children's wrists, and that he disciplined students by locking them outside his classroom. The Administrative Law Judge now turns to whether Licensee's conduct violated standards of conduct for teachers.

### B.  Unreasonable Discipline

The Committee alleges Licensee's conduct constituted unreasonable discipline in violation of Minn. R. 8710.2100, subp. 2(D). This standard of professional conduct, which is part of the Board's code of ethics for teachers, provides that a "teacher shall take reasonable disciplinary action in exercising the authority to provide an atmosphere conducive to learning."[145] Licensee contends that he used only reasonable force and that his physical conduct with students was necessary for "breaking up fights and restoring order."[146]

Minnesota law bars teachers from using corporal punishment to reform, or as a penalty for, unacceptable student conduct.[147] Corporal punishment includes "hitting or spanking a person with or without an object" or unreasonable physical force causing bodily harm or substantial emotional harm.[148] Yet, teachers may use "reasonable force" with a student "when it is necessary under the circumstances to correct or restrain a student or prevent bodily harm or death to another."[149]

Licensee's use of physical discipline with the children in his second grade classroom constituted unlawful corporal punishment. There is no evidence in the record showing that Licensee was faced with a student who presented a risk of harm requiring Licensee to intervene with force. If Licensee was unable to handle the situation in his classroom, Licensee could have requested assistance from another teacher, as Averbeck offered. He also could have contacted behavior support staff to seek an intervention. Instead, Licensee used physical discipline to correct the children, and in doing so, violated the code of ethics for teachers.

Licensee also used unreasonable discipline by locking children out of the classroom, leaving them in the hallway without adult supervision. Both Myrold and Principal Martin testified that teachers were not permitted to lock children out of classrooms, without adult supervision, in order to reform their behavior. Licensee contends that he "locked a student out of the classroom to stop her from bullying a medically fragile student."[150] This explanation is insufficient to justify Licensee's conduct. Further, Licensee's claim as to a single incident does not explain the multiple

---

[145] Minn. R. 8710.2100, subp. 2(D).
[146] Licensee's Closing Statement (Feb. 27, 2019).
[147] Minn. Stat. § 121A.58, subd. 2 (2018).
[148] *Id.*, subd. 1 (2018).
[149] Minn. Stat. § 121A.582 (2018).
[150] Licensee's Closing Statement (Feb. 27, 2019).

instances in which he locked children in the hallway. Additionally, Licensee's explanation is not supported by the record, since Myrold discovered K.B. and K.W., the medically-fragile student, locked outside together. This incident is particularly concerning since K.B. and K.W. were special education students who required additional support and caretaking, and when Myrold found them, K.W. was curled up on the floor, outside the locked door, crying.

The Committee has established Licensee violated Minn. R. 8710.2100, subp. 2(D) by using discipline with his students that was not reasonable. On this basis, the Board has grounds to discipline Licensee.[151]

### C. Immoral Conduct

The Committee also contends that Licensee's actions were immoral conduct in violation of Minn. Stat. § 122A.20, subd. 1(a)(1). Licensee maintains that his actions were moral, professional, and justified by the circumstances in his classroom.[152]

"Immoral conduct" is not defined in Minn. Stat. § 122A.20, and this concept has been referenced as a "nebulous" standard.[153] Nevertheless, courts interpreting this term have applied "common and approved usage and the rules of grammar" to determine the meaning of immoral conduct.[154] In an unpublished decision, the Minnesota Court of Appeals defined it as conduct that is "corrupt, indecent, depraved or dissolute, or . . . conduct which offends the morals of the community in which it occurred."[155] The Court of Appeals also cited favorably to a teacher discipline case written by the Missouri Court of Appeals, citing a dictionary definition and stating immoral conduct is:

> [N]ot in conformity with accepted principles of right and wrong behavior; contrary to the moral code of the community; wicked; especially not in conformance with accepted standards of proper sexual behavior; unchaste; lewd; licentious; obscene. Each of these definitive terms shares a common element of wrongful intent or conscious disregard of established mores such that the act itself bespeaks or permits a presumption of knowledge of its wrongful character.[156]

In addition to these standards, intent is a factor in determining whether certain actions constitute immoral conduct.[157]

---

[151] *Id.*, subp. 5(C)-(D).
[152] *See* Licensee's Closing Statement (Feb. 27, 2019).
[153] *Falgren v. State, Bd. of Teaching*, 545 N.W.2d 901, 908 (Minn. 1996).
[154] *Shaw v. Minn. Bd. of Teaching*, No. C0-00-2173, 2001 WL 605096, *2 (Minn. Ct. App. Jun. 5, 2001).
[155] *Id.* at *3.
[156] *Id.*; *see also Howard v. Missouri State Bd. of Educ.*, 913 S.W.2d 887, 891 (Mo. Ct. App. 1995).
[157] *Liffrig v. ISD No. 442*, 292 N.W.2d 726, 729-30 (Minn. 1980) (considering whether school principal engaged in immoral conduct in connection with appeal of his discharge and discussing the principal's intent related to his actions).

15

The Administrative Law Judge concludes that Licensee's actions toward the students in his classroom constituted immoral conduct. The record shows that Licensee's conduct with his seven- and eight-year old students included hitting and spanking them, and squeezing their wrists. It is possible that this alone would justify a finding that Licensee engaged in immoral conduct. Minnesota law prohibits the use of corporal punishment on school children, and Principal Martin specifically told Licensee that he "should never put hands on a child."[158] Further, Licensee was found responsible for maltreatment by physical abuse in five separate maltreatment determinations by MDE.[159] This evidence shows that a community standard exists regarding the limits of a teacher's discipline of students and that Licensee acted contrary to the standard.

But Licensee engaged in other conduct that further tips the balance in favor of an immoral conduct finding. Licensee isolated the children in his class from adults who would have been able to intervene on their behalf: he kept his classroom door locked; he prevented Angell and Averbeck from coming into his classroom; and he papered over the window to his classroom so others could not observe his contact with the children. MDE's maltreatment investigator determined that these actions prevented staff from witnessing Licensee's "most egregious" behavior.[160] There is evidence in the record that Licensee threatened the children with the return of a substitute teacher they did not like if they told anyone about his actions. Further, Licensee engaged in harsh non-physical discipline of children; when he believed students were misbehaving, he shut them out of the classroom, sometimes physically putting them in the hallway, and then locked them out. Licensee's actions were intentional and allowed him to use physical discipline on the children without immediate detection, including acts qualifying as maltreatment by physical abuse of multiple children.

The legislature has declared that "the public policy of this state is to protect children whose health or welfare may be jeopardized through physical abuse . . . ."[161] To that end, teachers are mandated reporters and if a teacher "knows or has reason to believe" that a child is being physically abused, the teacher must make a report to designated authorities.[162] This requirement is intended to "protect children and promote child safety."[163] Licensee's isolation of the children in his classroom prevented other teachers from seeing reportable conduct. Licensee's actions, both isolating the children and physically punishing them, were contrary to Minnesota's express policy in favor of protecting children. The record, considered as a whole, shows Licensee engaged in actions constituting immoral conduct.

## V. Conclusion

---

[158] Test. of C. Martin; Ex. 14 at PELSB0063.
[159] Exs. 3-7.
[160] Ex. 7 at PELSB0054.
[161] Minn. Stat. § 626.556, subd. 1 (2018).
[162] *Id.*, subd. 2(a)(1) (2018).
[163] *Id.*, subd. 1(a)(1).

16

[126427]

The Administrative Law Judge determines that Licensee violated standards of conduct applicable to teachers under Minnesota law and rule. As a result, the Administrative Law Judge recommends that the Board impose discipline upon Licensee.

J. P. D.

# CERTIFICATE OF SERVICE

RECEIVED
APR 04 2019
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

Re: *In re the Teaching License of Herandez Cortez Evans*
OAH Docket No. 71-1304-35417

STATE OF MINNESOTA )
                                ) ss.
COUNTY OF RAMSEY )

KATERINA SCHUH, being first duly sworn, deposes and says:

That at the City of St. Paul, County of Ramsey and State of Minnesota on the 27th day of March, 2019, she caused to be served the copy of the **ARGUMENTS AND EXCEPTIONS AND PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**, by depositing the same in the United States mail at said city and state, true and correct copies thereof, properly enveloped with prepaid first class postage, and addressed to:

Herandez Cortez Evans
149 East Morton Street, Apt. 12
St. Paul, MN 55107

A courtesy copy of the Arguments and Exceptions and Proposed Findings of Fact, Conclusions of Law, and Order was also transmitted to Mr. Evans by email at cortez341chi@yahoo.com.

I declare under penalty of perjury that everything I have stated in this document is true and correct.

Dated: March 27, 2019

_Katerina Schuh_
KATERINA SCHUH